IN RE THE MARRIAGE OF:

Martha E. DERR, Joint-Petitioner-Respondent-Cross-Appellant,

v.

Michael J. DERR, Joint-Petitioner-Appellant-Cross-Respondent.

Court of Appeals

*No. 03–2181. Submitted on briefs April 22, 2004.—Decided March 17, 2005.*

2005 WI App 63

(Also reported in 696 N.W.2d 170.)

681

682

683

On behalf of the joint-petitioner-appellant-cross-respondent, the cause was submitted on the briefs of *Walter R. Stewart* of *W.R. Stewart & Associates, S.C.*, Madison.

On behalf of the joint-petitioner-respondent-cross-appellant, the cause was submitted on the briefs of *Cynthia A. Curtes* of *Curtes & Bednarek, S.C.*, Mt. Horeb.

Before Dykman, Vergeront and Lundsten, JJ.

¶ 1. LUNDSTEN, J.   This is a divorce case involving challenges to property division and child support. With respect to property division, Michael Derr's appeal and Martha Derr's cross-appeal each challenge the circuit court's categorization of items as non-divisible. Martha argues that the court improperly categorized a gifted apartment building as Michael's non-divisible property. Michael contends the court improperly categorized a mortgage debt relating to the same apartment building as non-divisible. Michael also asserts the circuit court erred when it determined that he "wasted" $45,000 and counted that amount against him when dividing property. Finally, Michael argues that the circuit court incorrectly determined his income for purposes of calculating child support.

¶ 2.   We conclude that the circuit court correctly categorized the apartment building as Michael's non-divisible property, but that the court should have deemed the mortgage debt a divisible debt. We also conclude that the circuit court properly determined that Michael wasted the $45,000. Finally, we conclude that the court correctly determined Michael's income for purposes of child support. Accordingly, we affirm in part, reverse in part, and remand with directions.

690

## Background

¶ 3.  Michael and Martha married in 1990. They have one child, born in August 1993.

¶ 4.  In 1994, Michael's parents gave him a 27–unit apartment building that was titled solely in Michael's name. In 1999, Michael and Martha borrowed $300,000 and used this borrowed money for the benefit of the marriage. The $300,000 loan was a mortgage equity loan using Michael's apartment building as collateral.[1] The mortgage note indicated that the loan was made to both Michael and Martha, and mortgage payments were made with marital funds. At the time of the divorce, the outstanding principal balance on the mortgage loan was $282,935 and the fair market value of the apartment building was $905,000.

¶ 5.  During the marriage, Michael managed his 27–unit apartment building and other smaller apartment buildings. The rents from these properties appear to have been the major source of income for the family. At some point, Michael lost approximately $45,000 in a type of investing activity commonly referred to as "day trading."

¶ 6.  In the divorce judgment, the circuit court categorized the 27–unit apartment building and the

[1] The parties treat the 1999 loan as a simple equity loan that produced $300,000 in cash and debt for the family. They ignore any costs associated with closing the loan. It appears from the record and briefing that Michael had twice before secured mortgage loans in his name only on the apartment building. Despite this additional information, we follow the parties' lead and focus only on the 1999 loan and treat it as a simple transaction:  a $300,000 equity loan with the apartment building as collateral, with the proceeds going to Michael and Martha, and with $300,000 of debt incurred by Michael and Martha.

mortgage debt as Michael's non-divisible asset and non-divisible debt. The court also concluded that the $45,000 that Michael lost in day trading was "wasted" within the meaning of WIS. STAT. § 767.275 (2003–04).[2] The court took this "wasting" into account by allocating to Michael $45,000 that did not exist. The property division required that Michael pay Martha an equalizing payment of $157,417. The circuit court also imputed to Michael monthly income of $3,200 and used this amount when calculating that Michael must pay to Martha $60 per month in child support. We refer to additional relevant facts as needed below.

## Discussion

### I. Classification of the Apartment Building and the Related Mortgage Debt as "Divisible" or "Non-Divisible"

¶ 7.  Michael's appeal and Martha's cross-appeal both address whether the 27–unit apartment building and the related mortgage debt were properly categorized as non-divisible under WIS. STAT. § 767.255(2)(a). As set forth below, we conclude that the building is Michael's non-divisible asset, but that the debt is subject to division.

¶ 8.  We think a full understanding of the terms and analyses we use to resolve these property division disputes requires that we first provide a summary of certain aspects of property division law and then explain the terms we have chosen to use and why we use them. We use the term "tracing" instead of using "identity" language and we explain the limited nature of the

---

[2] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

tracing inquiry. We also use "donative intent" instead of "character" terminology and explain the nature of this inquiry. What prompts us is the fact that several of Michael's and Martha's property division arguments employing "identity" and "character" terminology are either misdirected or confusing. We do not fault the parties. A reading of our twenty or so cases addressing WIS. STAT. § 767.255(2)(a) and disputes involving divisible/non-divisible categorization leads to the conclusion that two phrases—"loss of identity" and "loss of character"—are the source of considerable confusion, largely because it is too easy to misunderstand what we mean when we use these non-descriptive phrases. For example, when cash is converted to stock, one might think the asset "lost its identity" as cash. Or, one might think the "character" of the asset changed from cash to stock. But a scrupulous student of our case law will recognize that both of these thoughts are off the mark. In fact, our example provides no clue about any change in "character" because it makes no reference to any factor relevant to donative intent. The example does show that there has been no "loss of identity," but only because identity is simply a matter of tracing and the stock traces directly to the cash. Before addressing the tracing and donative intent inquiries in more detail, we provide a brief overview of § 767.255(2)(a).

*A. Property Division Law and*
*WIS. STAT. § 767.255(2)(a)*

■

¶ 9.   We frequently say that a circuit court's decision on property division is discretionary. *See, e.g., In re Marriage of Brandt v. Brandt*, 145 Wis. 2d 394, 406, 427 N.W.2d 126 (Ct. App. 1988). But a more precise statement is this:   A circuit court's decision on how to divide

*divisible* property is discretionary. This refinement is helpful because circuit courts are often required to resolve preliminary non-discretionary property division questions under Wis. Stat. § 767.255(2)(a).

¶ 10. The general rule is that assets and debts acquired by either party before or during the marriage are divisible upon divorce. *See McLaren v. McLaren*, 2003 WI App 125, ¶ 8, 265 Wis. 2d 529, 665 N.W.2d 405. There is a statutory exception for property acquired (1) by gift, (2) by reason of death, or (3) with funds from either of the first two sources. Wis. Stat. § 767.255(2)(a). Specifically, that statute provides that if a party acquires property:

> 1. As a gift from a person other than the other party.
>
> 2. By reason of the death of another . . . .
>
> 3. With funds acquired in a manner provided in subd. 1. or 2.

such property "is not subject to a property division." Wis. Stat. § 767.255(2)(a).[3] As we shall see, the application of this subsection involves both fact finding and

---

[3] Wisconsin Stat. § 767.255 reads, in pertinent part:

**(1)** Upon every judgment of annulment, divorce or legal separation, or in rendering a judgment in an action under s. 767.02(1)(h), the court shall divide the property of the parties and divest and transfer the title of any such property accordingly . . . .

**(2)**(a) Except as provided in par. (b), any property shown to have been acquired by either party prior to or during the course of the marriage in any of the following ways shall remain the property of that party and is not subject to a property division under this section:

1. As a gift from a person other than the other party.

legal questions, but it does not involve the exercise of discretion.

¶ 11. When a party to a divorce asserts that property, or some part of the value of property, is not subject to division, that party has the burden of showing that the property is non-divisible at the time of the divorce. *See Krejci v. Krejci*, 2003 WI App 160, ¶¶ 30, 32–33, 266 Wis. 2d 284, 667 N.W.2d 780 (full appreci-

---

2. By reason of the death of another, including, but not limited to, life insurance proceeds; payments made under a deferred employment benefit plan, as defined in s. 766.01(4)(a), or an individual retirement account; and property acquired by right of survivorship, by a trust distribution, by bequest or inheritance or by a payable on death or a transfer on death arrangement under ch. 705.

3. With funds acquired in a manner provided in subd. 1. or 2.

(b) Paragraph (a) does not apply if the court finds that refusal to divide the property will create a hardship on the other party or on the children of the marriage. If the court makes such a finding, the court may divest the party of the property in a fair and equitable manner.

(3) The court shall presume that all property not described in sub. (2)(a) is to be divided equally between the parties, but may alter this distribution without regard to marital misconduct after considering all of the following:

(a) The length of the marriage.

(b) The property brought to the marriage by each party.

(c) Whether one of the parties has substantial assets not subject to division by the court.

(d) The contribution of each party to the marriage, giving appropriate economic value to each party's contribution in homemaking and child care services.

. . . .

(m) Such other factors as the court may in each individual case determine to be relevant.

ated value of real estate treated as divisible where spouse asserting that property was non-divisible failed to present evidence showing which part of the property's appreciation was attributable to the original non-divisible inherited property); *Brandt*, 145 Wis. 2d at 403, 408, 411–13 (wife asserting that part of an investment account was non-divisible did not meet her burden where, although it was undisputed that she originally started the account with inherited non-divisible money, she failed to demonstrate "with any degree of certainty" the current portion of the investment account relating to the inherited money).[4]

■■■■

¶ 12.  Notably, the categorization of property as non-divisible under WIS. STAT. § 767.255(2)(a) does not necessarily dictate how such property will be treated

---

[4] The burden language in *Finley v. Finley*, 2002 WI App 144, 256 Wis. 2d 508, 648 N.W.2d 536, though arguably incomplete, is consistent with our statement of the burden in ¶ 11. In *Finley*, we said:  "The party claiming an exemption must first establish the gifted or inherited status of the property; then the burden is on the other party to prove that the property has lost its exempt status." *Id.*, ¶ 39. This explanation of the burden might be read as leaving out the requirement that the party claiming that property, or part of the value of property, is exempt has the burden of showing its exempt status as of the time of the divorce. But *Finley*'s burden language relies on *In re Marriage of Brandt v. Brandt*, 145 Wis. 2d 394, 427 N.W.2d 126 (Ct. App. 1988), and *Brandt* plainly indicates that the party seeking the exemption must show that its exempt status is "preserved," that is, exempt at the time of the divorce. *See Brandt*, 145 Wis. 2d at 408–09. Indeed, in *Brandt* we went on to hold that although the wife met her burden of showing the original inherited status of her property, she failed to meet her burden of showing that the property remained non-divisible at the time of the divorce. *Id.* at 409, 411–13.

when the court divides divisible property. Under some circumstances courts may avoid "hardship" or inequities that might result from according property non-divisible status. Note the following examples:

- Under § 767.255(2)(b), a court may treat non-divisible property as divisible property if failing to do so would "create a hardship on the other party or on the children of the marriage." The hardship exception involves both a legal question and the exercise of discretion. Once factual disputes are resolved, the existence of a "hardship" is a question of law. *See Doerr v. Doerr*, 189 Wis. 2d 112, 121, 525 N.W.2d 745 (Ct. App. 1994). However, whether an identified "hardship" warrants the "invasion" of non-divisible property is a discretionary determination. *Id.* at 121–22; *see also Spindler v. Spindler*, 207 Wis. 2d 327, 341, 558 N.W.2d 645 (Ct. App. 1996).

- Section 767.255(3)(c) authorizes circuit courts to consider "substantial" non-divisible property owned by one party when exercising discretion to divide divisible property.

- When making the discretionary decision whether to deviate from equal property division, a court may consider the fact that divisible property was generated in whole or in part by one party's donation of non-divisible property to the marriage. *See Schwartz v. Linders*, 145 Wis. 2d 258, 259, 262–63, 426 N.W.2d 97 (Ct. App. 1988) (in marriage of short duration, circuit court should have considered the fact that a jointly owned investment account was seeded by the husband with non-divisible inherited funds; court could have relied on that information to deviate from an equal property division).

697

¶ 13. Thus, in this area of divorce law, like others, there are sometimes different routes to the same result. Still, correctly categorizing property as divisible or non-divisible is important because it gives the circuit court the proper starting point for exercising discretion. Also, if the case is appealed, the correct categorization facilitates our review of the circuit court's exercise of discretion in dividing divisible property. When a reviewing court cannot tell from the record whether the circuit court would have assigned property in the same manner had the circuit court acted under a correct view of the divisible status of property, remand is necessary. As will be seen, that is what prompts remand in this case.

*B. Identity/Tracing and Character/Donative Intent*

¶ 14. In our case law addressing whether property is subject to division under Wis. Stat. § 767.255(2)(a), we often speak of "identity" and "character" as if they constitute a complete two-pronged analysis. The following language is typical:

> The party seeking exclusion of inherited or gifted property must prove that it has retained its character and identity. Once the recipient of inherited property has met these requirements, the opposing party has the opportunity to establish by sufficient countervailing evidence the property is not inherited, or has otherwise lost its exempt status because its character or identity has not been preserved.

*Krejci*, 266 Wis. 2d 284, ¶ 32 (citations omitted); *see also Spindler*, 207 Wis. 2d at 338; *Friebel v. Friebel*, 181 Wis. 2d 285, 298, 510 N.W.2d 767 (Ct. App. 1993).

However, as set forth below, the "identity" and "character" inquiries do not comprise a test. Instead, they are labels for two distinct inquiries—tracing and donative intent—that may or may not fully resolve the divisible status of property at the time of a divorce.

### 1. Tracing

¶ 15.   The "identity" inquiry "addresses whether the gifted or inherited asset has been preserved in some present identifiable form so that it can be meaningfully valued and assigned." *Brandt*, 145 Wis. 2d at 411. Thus, the "identity" inquiry is purely a matter of tracing; it is the job of determining the value and source of an asset or the value and source of a part of an asset.[5]

¶ 16.   As we explain below, tracing, by itself, does not reveal whether property is divisible. *See Arneson v. Arneson*, 120 Wis. 2d 236, 244, 355 N.W.2d 16 (Ct. App.

---

[5] We use the term "tracing" both because of its descriptive value and because tracing language has often been used in our "identity" discussions. *See, e.g., Krejci v. Krejci*, 2003 WI App 160, ¶ 22, 266 Wis. 2d 284, 667 N.W.2d 780; *Preuss v. Preuss*, 195 Wis. 2d 95, 103, 536 N.W.2d 101 (Ct. App. 1995); *Brandt*, 145 Wis. 2d at 415–16; *Trattles v. Trattles*, 126 Wis. 2d 219, 227–28, 376 N.W.2d 379 (Ct. App. 1985); *Weiss v. Weiss*, 122 Wis. 2d 688, 694, 365 N.W.2d 608 (Ct. App. 1985); *see also Doerr v. Doerr*, 189 Wis. 2d 112, 133, 525 N.W.2d 745 (Ct. App. 1994); *Friebel v. Friebel*, 181 Wis. 2d 285, 301, 510 N.W.2d 767 (Ct. App. 1993). In his article on this topic in 1990, Judge Neal Nettesheim seemingly suggested that "tracing" is a helpful term when he used "identity/tracing" instead of just "identity." *See* Judge Neal Nettesheim, *Gifted and Inherited Property: To Divide or Not Divide?* 10 Wis. J. Fam. L., No. 4, 127, 141 (Oct. 1990).

1984) ("[t]he mere fact that the existence of this subsequently purchased property can be traced to income generated by" non-divisible property does not mean that the purchased property is non-divisible). Still, we begin by observing that, if nothing but tracing is disputed, tracing alone may resolve whether property is divisible. For example, if parties to a divorce dispute whether an asset was purchased with non-divisible funds, but agree that if it was the asset is non-divisible, tracing alone resolves the dispute.

¶ 17. In addition, case law holds that tracing produces an answer when the party asserting that an asset is non-divisible is *unable* to provide evidence that permits the tracing of an identifiable part of the asset to an original non-divisible asset. Our *Brandt* decision provides a good example. In *Brandt*, the wife deposited inherited non-divisible money in an investment account. *Brandt*, 145 Wis. 2d at 403. Years later, at the time of the divorce, no part of the value of the account could be traced to the inherited non-divisible money because "countless" subsequent transactions, including withdrawals and deposits "from various sources, including both parties' salaries, gifts, other inheritances, and other joint and sole accounts," prevented the court from determining "with any degree of certainty" the current portion of the investment account attributable to the inherited money. *Id.* at 411–13. The lesson of *Brandt* is that an asset is divisible if no identifiable part of that asset can be reliably traced and attributed to a non-divisible asset. *See also Krejci*, 266 Wis. 2d 284, ¶¶ 30–33 (evidence failed to show with any specificity that any part of the appreciation of real estate could be traced and attributed to the original inherited property).

¶ 18. Frequently in our case law, tracing either is a non-issue or is so obvious that it is barely mentioned. For example, in *Spindler*, 207 Wis. 2d 327, we gave the tracing inquiry short-shrift: "It is not seriously disputed that the cottage possesses the same physical form it had when it was gifted to Fredric and can be easily valued." *Id.* at 339; *see also id.* at 334–36, 339–40 (cottage owned by one spouse remained fully non-divisible where non-owning spouse's efforts to maintain and improve the property did not significantly add to its value and court accepted as true expert testimony that the entire appreciation in value was attributable to increased value of the land alone).

¶ 19. Most important here, however, are cases demonstrating that tracing, by itself, does not answer whether a current asset, or any part of the value of a current asset, is divisible or non-divisible. Stated differently, tracing is nothing more than the exercise of following an asset trail. If an asset, or component part of an asset, can be traced to a source, we then rely on *other* principles and rules to determine whether the traced asset is divisible or non-divisible. In this regard, *Friebel* is instructive.

¶ 20. In *Friebel*, a wife funded an investment account with funds from three sources. *Friebel*, 181 Wis. 2d at 290. The account earned interest and experienced realized and unrealized gains. *Id.* at 290–91. We determined that all funds put into the account were non-divisible gifts owned by the wife and we engaged in tracing. *Id.* at 293–99. That is, we identified the component parts of the current account and the source and value of those component parts as follows. At the time of the divorce the investment account balance was $153,654. Of that amount, $11,362 was attributable to interest income, $3,955 to realized gains, and $4,085 to

unrealized gains. *Id.* at 290–91, 297, 299. What remained was $134,252, comprised of original gifted funds. This completed the tracing analysis. We then applied other legal principles to decide whether these amounts were divisible. Of the $153,654 investment account balance, $134,252 was non-divisible because it was attributable to the original non-divisible gifts. *Id.* at 296. The $11,362 portion of the balance was divisible because it was divisible interest income under *Arneson*. *Friebel*, 181 Wis. 2d at 296–97. We were unable to categorize the remainder—$3,955 in realized gains and $4,085 in unrealized gains—because of insufficient information. *Id.* at 297. We remanded because we concluded that additional fact finding was needed to determine whether these amounts were attributable to divisible income or non-divisible appreciation. *See id.*[6]

---

[6] It is noteworthy that our analysis in *Friebel* of the income ($11,362) and the "gains" ($3,955 and $4,085) did not involve a donative intent inquiry. We explained in *Arneson v. Arneson*, 120 Wis. 2d 236, 244–45, 355 N.W.2d 16 (Ct. App. 1984), that income generated by non-divisible stock is not exempt from division under Wis. Stat. § 767.255(2)(a), because the income is "not acquired by gift, bequest, devise or inheritance" nor is it "paid for with funds so acquired since income is not purchased—it is earned." Donative intent plays no role in this analysis. Similarly, donative intent appears to play no role when the question is appreciated value. In *Plachta v. Plachta*, 118 Wis. 2d 329, 333, 348 N.W.2d 193 (Ct. App. 1984), we held that appreciation due to general economic conditions remains non-divisible: "We find nothing in ch. 767 to support the argument that an appreciation in value of nonmarital property takes on the character of marital property, especially when it has increased in value without any contributions from the nonowning spouse." Consequently, in *Friebel*, we remanded so that the circuit court could determine whether the "gains" were income

¶ 21. We acknowledge that in *Friebel* our tracing exercise was interwoven with the rest of our analysis, and we sometimes used confusing language. Nonetheless, the tracing exercise was distinct from whether the traced components of the investment account were subject to division.

¶ 22. To summarize, in this opinion we use the term "tracing," instead of "identity" or "loss of identity." Tracing is the job of determining the value and source of an asset or the value and source of a part of an asset. Tracing is nothing more than the exercise of following an asset trail. Tracing does not, by itself, resolve whether an item is divisible under Wis. Stat.

within the meaning of *Arneson* or appreciation within the meaning of *Plachta. See Friebel*, 181 Wis. 2d at 297.

We caution that when the added value or equity arising from a gifted or inherited asset is not the type of income addressed in *Arneson* and not the sort of straightforward market-based appreciation addressed in *Plachta*, the question whether such new value or equity is divisible must be analyzed with care. Our cases and the one supreme court case we have located on this topic do not appear to set forth a unified rule. *See Wierman v. Wierman*, 130 Wis. 2d 425, 430–32, 439–41, 387 N.W.2d 744 (1986) (growth in value of a wife's non-divisible interest in a business operated by her father); *Metz v. Keener*, 215 Wis. 2d 626, 628–29, 632–34, 573 N.W.2d 865 (Ct. App. 1997) (retained earnings fund of an inherited corporation where owning spouse "had full access, control and right to the undistributed income"); *Doerr*, 189 Wis. 2d at 132–35 (income from a trust that the owning spouse had control over, but where increase in value of the trust was not attributable to the efforts of either spouse); *Friebel*, 181 Wis. 2d at 294–95 (income generated by a trust, controlled by a trustee, and distributed to the beneficiary); *Lendman v. Lendman*, 157 Wis. 2d 606, 609–12, 460 N.W.2d 781 (Ct. App. 1990) (appreciation purchased by earned income of a corporation acquired by inherited funds).

703

§ 767.255(2)(a), unless tracing is either the only disputed issue or the party asking the court to declare an asset non-divisible is unable to provide evidence that permits the tracing of an identifiable part of the asset to an original non-divisible asset.

## 2. Donative Intent

¶ 23. As pertains to WIS. STAT. § 767.255(2)(a), the "character" inquiry involves no more and no less than determining whether the owning spouse intended to donate non-divisible property to the marriage, that is, did the owning spouse have donative intent. *See Finley v. Finley*, 2002 WI App 144, ¶ 38, 256 Wis. 2d 508, 648 N.W.2d 536 (the character issue is whether "the owning spouse had a donative intent"); *Friebel*, 181 Wis. 2d at 298 (owning spouse "never demonstrated any donative intent with regard to the remaining assets in her investment account. Thus, her gifted property retained its character."); *Zirngibl v. Zirngibl*, 165 Wis. 2d 130, 136, 477 N.W.2d 637 (Ct. App. 1991) ("There is no dispute that the $16,167 was gifted property, that it went into a jointly titled bank account and that it was used to purchase the parties' residence. The dispute centers on the issue of donative intent."); *Popp v. Popp*, 146 Wis. 2d 778, 788, 432 N.W.2d 600 (Ct. App. 1988) ("Donative intent of the owner of the exempt property is an issue when deciding whether the character of the property has been changed."); *Brandt*, 145 Wis. 2d at 410–11 ("the donative intent of the owner of the exempt property" is at issue in "character" cases).

¶ 24. "Character" is a label that fails to describe the pertinent inquiry. Unless one is steeped in "character" case law, neither "character" nor "loss of character" brings to mind donative intent. We think it apparent

that "character" terminology just adds a layer of haze to a topic that is already sufficiently complicated. Why not cut to the quick and use the term "donative intent" when talking about donative intent? No reason comes to mind and, therefore, in this opinion we will, when possible, avoid the terms "character" and "loss of character" and instead speak directly in terms of donative intent.[7]

---

[7] So far as we can tell, there was no conscious decision by Wisconsin courts to adopt the terms "identity" and "character" because those terms have descriptive value. Our research indicates that the word "character" in Wisconsin divorce law first appears in *Bonnell v. Bonnell*, 117 Wis. 2d 241, 344 N.W.2d 123 (1984), although it does not seem that the supreme court in *Bonnell* meant for "character" to become the catchall term for the donative intent inquiry. *See id.* at 247–48. Shortly after *Bonnell*, in *Weiss*, 122 Wis. 2d 688, we quoted from *Bonnell*, emphasizing the term "character." *Weiss*, 122 Wis. 2d at 692. The first divorce case we have located using the term "identity" is *Plachta*, 118 Wis. 2d at 333. *Plachta* cites cases from other jurisdictions that use the term identity. *Id. Plachta* is also the first case to use "character" and "identity" in the same opinion, but we seemed to blend or string the two terms together as one concept. *Id.* at 333, 334. *Weiss* appears to be the first case that starts to develop a distinction between character and identity. *Weiss*, 122 Wis. 2d at 694; *see also Trattles*, 126 Wis. 2d at 225–28.

Also, we are cognizant that the term "tracing" is used to describe the identity inquiry in marital property cases under Wis. Stat. ch. 766. *See, e.g., Estate of Kobylski v. Hellstern*, 178 Wis. 2d 158, 174, 503 N.W.2d 369 (Ct. App. 1993); *Lloyd v. Lloyd*, 170 Wis. 2d 240, 257–58, 487 N.W.2d 647 (Ct. App. 1992). Indeed, in *Lloyd* we relied on *Brandt* for the definition of identity and we characterized the inquiry as "tracing." *Lloyd*, 170 Wis. 2d at 260. *Lloyd* could be read to suggest that the nature of the identity/tracing inquiry is the same in both the ch. 766 marital property context and the Wis. Stat. ch. 767 divorce

¶ 25. In order to properly analyze the parties' arguments on donative intent, we must first examine the nature of the inquiry in more detail. Although courts often—and correctly—resolve donative intent as a matter of law, by applying a legal presumption to undisputed historical facts, donative intent is ultimately a question of subjective donative intent.

¶ 26. The seminal case on donative intent is *Bonnell v. Bonnell*, 117 Wis. 2d 241, 344 N.W.2d 123 (1984). In *Bonnell*, the supreme court addressed whether inherited non-divisible property lost its "character" when it was transferred into joint tenancy. *Id.* at 245. It is evident that the supreme court treated donative intent as a factual issue involving subjective donative intent which, in *Bonnell*, had first been resolved by the circuit court. The supreme court explained:

> It is clear that Mrs. Bonnell intended to create a joint tenancy in the subject properties. This is evidenced by a deed executed on August 23, 1978, by Mr. and Mrs. Bonnell, transferring ownership to "John Bonnell and Betty Bonnell, husband and wife, as joint tenants with right of survivorship." Moreover, *the trial record supports the trial court's finding that Mrs. Bonnell intended to make a gift of the inherited property to Mr. Bonnell.*

*Id.* at 245–46 (citation omitted; emphasis added). Following this, the supreme court immediately quoted

context. *See Lloyd*, 170 Wis. 2d at 259–60. However, at least one other case might be read as suggesting the identity inquiry is somewhat different in the marital property context. *See Gardner v. Gardner*, 190 Wis. 2d 216, 236 n.2, 527 N.W.2d 701 (Ct. App. 1994). Suffice to say that we speak in this opinion about the proper analysis only in divorce cases under ch. 767.

Mrs. Bonnell's own testimony indicating that she gave her property to the marriage to satisfy a demanding husband:

> " 'Well, I got tired of hearing about how nothing was John's. I made out a will leaving everything to him if I died, but that didn't seem to satisfy him. I thought if [transferring to joint tenancy] would make him happy, why I would do that if I could find a lawyer to do it . . . . He didn't ask me in so many words, he just kept telling me that nothing was his.' "

*Id.* at 246.

¶ 27.  The treatment of donative intent as a fact question in *Bonnell* is consistent with the general law on gifting, which requires an intent to give on the part of the donor. *See, e.g., Potts v. Garionis*, 127 Wis. 2d 47, 50, 377 N.W.2d 204 (Ct. App. 1985). Furthermore, the supreme court again spoke of donative intent as if it were a fact question in *Wierman v. Wierman*, 130 Wis. 2d 425, 387 N.W.2d 744 (1986), another property division case. In *Wierman*, the court addressed whether property was non-divisible because it was originally gifted to a spouse within the meaning of Wis. Stat. § 767.255. *Wierman*, 130 Wis. 2d at 428–30. The husband in *Wierman* challenged the intent of the alleged donor, his father-in-law. In that context, the supreme court stated:  "Intent is a fact, and the circuit court's findings of fact concerning the [father-in-law's] intent will be sustained unless clearly erroneous." *Id.* at 429.

¶ 28.  Likewise in *Zirngibl*, 165 Wis. 2d 130, we treated donative intent as a question of subjective donative intent. In *Zirngibl*, a wife with non-divisible funds deposited those funds in a joint bank account and then the husband used the money to purchase a house

707

for the family. *Id.* at 135. We observed that these facts created a rebuttable presumption of donative intent, but then explained that the presumption had been overcome. *Id.* at 136. Unbeknownst to the wife, the husband had titled the house in his name only. *Id.* at 137. We affirmed the circuit court's implicit *factual* finding that the wife intended to give the money to the marriage only if it was used to purchase a home titled in both their names. *Id.* at 136–37 & n.1.

¶ 29.   A prominent donative intent case is *Trattles v. Trattles*, 126 Wis. 2d 219, 376 N.W.2d 379 (Ct. App. 1985). In that case, we did not expressly address whether donative intent is a matter of subjective donative intent, but our decision assumed as much. We observed that it was surprising that the owning spouse never testified that she did not intend to make a gift, an obvious reference to the absence of subjective donative intent evidence. *Id.* at 224 n.3. We also explained that the presumption we employed was that the owning spouse "made a *conscious* . . . decision" to gift her property. *Id.* at 227 (emphasis added).

¶ 30.   We acknowledge that some of our cases seemingly say that character/donative intent is ultimately a question of law. For example, in *Popp*, we said:

> Character, on the other hand, addresses the manner in which the parties have chosen to title or treat gifted or inherited assets. As with identity, we view a character determination as a conclusion of law dependent upon underlying factual findings. Again, this presents a question of law which we review *de novo.*

*Popp*, 146 Wis. 2d at 788 (citation omitted). But the meaning of such statements is not transparent. In *Popp*, we later appeared to speak in terms of subjective intent: "Nor is there any evidence of the requisite

708

donative intent (actual or constructive) on Richard's part. Richard . . . did nothing which expressly or impliedly indicated that he *wished or intended to gift these shares to Diana or convert them to marital property.*" *Id.* at 789 (citation omitted; emphasis added).

¶ 31.  In any event, we are bound by the supreme court decisions in *Bonnell* and *Wierman* and, therefore, the donative intent inquiry under WIS. STAT. § 767.255(2)(a) is directed at determining the owning party's subjective donative intent.

¶ 32.  Although donative intent is a question of subjective donative intent, ostensibly requiring factual resolution of the owning party's conscious subjective intent to make a gift, in most cases since *Bonnell* we have resolved donative intent questions by means of legal inference. That is, rather than review a circuit court's express factual finding regarding subjective intent, we have typically examined the factual circumstances of a transaction or series of transactions and relied on legal presumptions. Indeed, if published law is an indicator of cases generally, it seems that parties seldom testify about their subjective thoughts. Perhaps one reason for the apparent dearth of such testimony is that owning parties in these cases seldom consciously consider whether they are gifting. In any event, we think the frequency with which courts resolve donative intent as a matter of law based on circumstantial historical facts, rather than on testimony about subjective thoughts, reflects a healthy skepticism of self-serving, after-the-fact assertions on this topic.

¶ 33.  In *Trattles*, we first explained how the legal presumption works. When an owning spouse acts in a manner that would normally evince an intent to gift

property to the marriage, donative intent is presumed, subject to rebuttal by "sufficient countervailing evidence." *Trattles*, 126 Wis. 2d at 222–24; *see also Finley*, 256 Wis. 2d 508, ¶¶ 42–43. We are concluding in such cases that, in the absence of countervailing evidence, gifting is the only reasonable inference. *See Haldemann v. Haldemann*, 145 Wis. 2d 296, 307, 426 N.W.2d 107 (Ct. App. 1988) (" 'If only one reasonable inference is available, the drawing of that inference is a question of law.' " (quoting *Pfeifer v. World Serv. Life Ins. Co.*, 121 Wis. 2d 567, 571, 360 N.W.2d 65 (Ct. App. 1984))); *see also Hennekens v. Hoerl*, 160 Wis. 2d 144, 162, 465 N.W.2d 812 (1991) ("Whether an inference is reasonable is a question of law.").

¶ 34. Our cases identify several situations that create a rebuttable presumption of donative intent.

¶ 35. **Transferring non-divisible property to joint tenancy.** In *Trattles*, we discussed *Bonnell* and explained that donative intent is presumed when an owning spouse transfers non-divisible property to joint tenancy. *Trattles*, 126 Wis. 2d at 222–24, 226.

¶ 36. **Depositing non-divisible funds into a joint bank account.** When non-divisible funds are deposited in a joint bank account, even for a short time, donative intent is presumed. *Finley*, 256 Wis. 2d 508, ¶¶ 38, 42 (the length of time the funds remain in the joint account, along with other evidence, is "part of the inquiry into whether the presumption of donative intent is rebutted by other evidence").

¶ 37. **Using non-divisible funds to make purchases for the family**. When non-divisible funds are

expended to acquire property, goods, or services that are usually used for the mutual benefit of the parties, donative intent is presumed. *Trattles*, 126 Wis. 2d at 222, 225–27 (evidence that "gift proceeds were used to purchase household furnishings and effects, to pay for normal and usual household expenditures, [and] to pay for repairs, maintenance and improvement to the home the parties owned in joint tenancy" was presumptive evidence of donative intent).

■■

¶ 38.  **Using non-divisible funds to make payments on a mortgage debt that was incurred to acquire jointly owned real estate.** When non-divisible funds are used to make mortgage payments on a loan taken to acquire jointly owned real estate, donative intent is presumed. *Id.* at 222, 226–27.

■■

¶ 39.  When facts create a presumption of donative intent, rebuttal evidence may nonetheless show that the spouse did not intend to make a gift. Although the terminology we used in *Weberg v. Weberg*, 158 Wis. 2d 540, 463 N.W.2d 382 (Ct. App. 1990), is confusing, *Weberg* is nonetheless an example of a case in which the presumption was overcome. In *Weberg*, non-divisible funds deposited in a joint bank account remained non-divisible upon divorce because the circuit court believed the testimony of the owning spouse that the funds were held in the joint account only to protect the non-owning spouse if the owning spouse died. *Id.* at 550–52.[8]

---

[8] In *Weberg v. Weberg*, 158 Wis. 2d 540, 550–52, 463 N.W.2d 382 (Ct. App. 1990), we spoke of "commingling," a term used to describe the mixing of non-divisible property with divisible property. Most often, we use commingling language in the

¶ 40. We glean from these cases and normal rules of appellate review the following. Circumstantial historical facts may give rise to the legal presumption that an owning spouse gifted property to the marriage. This presumption arises if the owning spouse acts in a manner that would normally evince an intent to gift. However, because donative intent is ultimately a question of subjective donative intent, other evidence may persuade a circuit court that the owning spouse consciously considered the matter and subjectively intended that gifting not occur. In this circumstance, donative intent is lacking and the property remains non-divisible. At the same time, circuit courts are not obliged to accept the testimony of an owning spouse about his or her subjective thoughts. If a circuit court makes an express factual finding that a spouse consciously did intend to gift or consciously intended no gift, we will accord that finding deference. If the court

context of resolving a tracing dispute. In some circumstances, however, commingling might be evidence of donative intent. We provide this explanation because some of our cases speak of commingling as if it is synonymous with identity/tracing, *see, e.g., Doerr*, 189 Wis. 2d at 133 ("In *Torgerson* we expressly noted that no such 'commingling' [identity/tracing] or 'transmutation' [character/donative intent] claim was being made."); *Brandt*, 145 Wis. 2d at 407 ("We view a tracing or commingling determination by a trial court as presenting a question of fact."), and some cases might be misinterpreted as saying that commingling is, by itself, a distinct test, *see, e.g., Friebel*, 181 Wis. 2d at 298–99 ("[I]f the property has lost its character or identity through commingling with divisible property, then all the property is subject to division . . . . We conclude that the entire account was not tainted by and so commingled with the five percent of divisible property as to convert the remainder of the account into divisible property.").

does not make an express factual finding, we will normally assume fact finding consistent with the court's ultimate decision. For example, if the record contains evidence of subjective thoughts tending to rebut a presumption of donative intent, if the circuit court makes no express findings regarding this rebuttal evidence, and if the circuit court determines there was a gift, then we will normally assume the circuit court implicitly found the rebuttal evidence lacking in credibility. *See State v. Pallone*, 2000 WI 77, ¶ 44 n.13, 236 Wis. 2d 162, 613 N.W.2d 568 (when an express finding is not made, appellate courts normally assume the circuit court made findings in a manner that supports its final decision).[9]

---

[9] Another term that permeates this area of law is "transmutation." We do not use that term here because we conclude that it adds nothing. In several cases, we have indicated that "transmuted" is synonymous with "loss of character." *See Krejci,* 266 Wis. 2d 284, ¶ 31; *Popp v. Popp,* 146 Wis. 2d 778, 788, 432 N.W.2d 600 (Ct. App. 1988); *Brandt,* 145 Wis. 2d at 410; *Trattles,* 126 Wis. 2d at 226. But, other times, we have used the word more loosely to indicate the conversion of an asset from non-divisible to divisible. *See, e.g., Spindler v. Spindler,* 207 Wis. 2d 327, 336–37, 558 N.W.2d 645 (Ct. App. 1996) ("A substantial change in [character or identity] could be enough to transmute gifted property into marital property."); *Gardner,* 190 Wis. 2d at 236 ("To support her argument Dianne first turns to a series of property division cases which establish the concept of 'transmutation' of gifted or inherited property into joint property."). In *Zirngibl v. Zirngibl,* 165 Wis. 2d 130, 477 N.W.2d 637 (Ct. App. 1991), we indicated that "transmutation" was not a character/donative intent issue at all. In that case, we affirmed the circuit court's determination that non-divisible property remained non-divisible because, although the owning party deposited the non-divisible funds into a joint bank account, the owning party did not have donative intent because she was misled as to the purpose for which the money was to be used.

## C. Application of the Law to This Case: The Apartment Building and the Mortgage Debt

¶ 41. The following facts and conclusions relating to the apartment building and the mortgage debt are undisputed:

- Michael and Martha married in 1990.

- In 1994, Michael's parents gave him a 27–unit apartment building, which was titled solely in Michael's name.

- Immediately following the gifting, the apartment building was Michael's non-divisible property.

- In 1999, Michael and Martha borrowed $300,000 and used this borrowed money for the benefit of the marriage.

- The $300,000 loan was a mortgage equity loan using Michael's apartment building as collateral.

- The mortgage note indicated that the loan was made to both Michael and Martha.

- Mortgage payments were made with marital funds

- At the time of the divorce, the outstanding principal balance on the mortgage loan was $282,935.

---

After engaging in this analysis of donative intent, we said "transmutation analysis does not apply." *Id.* at 138. Obviously, this statement is puzzling in light of our several cases indicating that "transmutation analysis" is character/donative intent analysis. We fail to see the benefit of the continued use of the word "transmutation" and its variations.

714

- At the time of the divorce, the apartment build-ing had a fair market value of $905,000.

¶ 42.    The circuit court concluded that the apart-ment building was Michael's non-divisible property because it was gifted to Michael and because the apartment building did not subsequently lose either its "identity" or "character" during the marriage. The court treated the outstanding $282,935 mortgage debt as Michael's non-divisible debt.[10]

¶ 43.    Michael and Martha dispute whether the mortgage debt should be designated as divisible or non-divisible, and whether all or part of the apartment building was divisible property. For the reasons below, we conclude that the apartment building is Michael's non-divisible property, but that the mortgage debt is divisible.

### 1. The Mortgage Debt

¶ 44.    Michael challenges the circuit court's deci-sion that the remaining mortgage debt, $282,935, is his non-divisible debt. Before resolving this issue on its merits, we pause to reject Martha's contention that the circuit court's categorization of the debt as non-divisible was a discretionary decision.

---

[10] Although the circuit court did not expressly assign the mortgage debt to Michael, both parties and this court draw that inference. This is the only reasonable inference because the circuit court's sole discussion of the debt is in that part of its decision where it assigns the building to Michael as a non-divisible asset. In this context, the court referred to the mort-gage debt as an item that reduced the "net fair market value" of the building to $622,065 (the current value, $905,000, reduced by the outstanding mortgage debt, $282,935). Thus, the court purported to assign to Michael, as a non-divisible asset, the apartment building having a value of $622,065.

¶ 45.  Martha relies on *McLaren*, 265 Wis. 2d 529, for her assertion that the circuit court's decision—that the mortgage debt was non-divisible—was a discretionary decision entitled to deferential review. Her reliance on *McLaren* is understandable. In *McLaren*, we said: "The trial court did not misuse its discretion when it found the student loans to be [divisible] debt." *Id.*, ¶ 9. Later, we summarized: "The trial court appropriately exercised its discretion in including the student loans in the marital estate and ordering [the husband] to pay the marital consolidation loan to equalize [the wife's] payment of the student loans." *Id.*, ¶ 11. However, language in *McLaren* suggesting that circuit courts have discretion to exempt property or debt from division upon divorce is both erroneous and non-binding.[11] Under Wis. Stat. § 767.255, property (and presumably debt) subject to division includes all property of the parties acquired before or during the marriage, unless specifically exempted by statute. The specific exemptions are found in § 767.255(2)(a). The application of § 767.255(2)(a) involves both fact finding and questions of law. *See Wierman*, 130 Wis. 2d at 433; *Popp*, 146 Wis. 2d at 787–88 & n.2. We uphold findings of historical fact unless those findings are clearly erroneous. *See Popp*, 146 Wis. 2d at 801. We review questions of law *de novo*. *Id.* at 787.

¶ 46.  Moreover, a careful reading of *McLaren* shows that we were indeed reviewing a *discretionary* decision in that case. We reviewed the circuit court's decision to achieve an equal division of the parties' debts by allocating the wife's student loans to her and

[11] A court of appeals decision is non-binding when it conflicts with prior published decisions. *See Cook v. Cook*, 208 Wis. 2d 166, 189–90, 560 N.W.2d 246 (1997).

allocating other divisible debt to the husband. *McLaren*, 265 Wis. 2d 529, ¶¶ 9–11. We correctly stated that divisible debts included obligations of either party acquired before or during the marriage, unless specifically exempted by statute. We quoted the proper factors applicable to the division of divisible property, set forth in WIS. STAT. § 767.255(3), and concluded that the circuit court "examined the relevant facts, considered the proper factors of WIS. STAT. § 767.255(3) and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach." *McLaren*, 265 Wis. 2d 529, ¶ 11. We did not discuss the § 767.255(2)(a) exemptions and did not discuss tracing or donative intent. Thus, despite some language indicating otherwise, our review in *McLaren* was of the circuit court's exercise of discretion under § 767.255(3), not of its categorization of the debt under § 767.255(2)(a).[12]

¶ 47. Turning to the merits, Michael argues that the mortgage debt is a divisible debt because it was incurred to benefit the family. As Michael points out, it is undisputed that the $300,000 loan proceeds were used for the benefit of the family. Michael argues that

---

[12] We note that Martha might also have placed mistaken reliance on *Richmond v. Richmond*, 2002 WI App 25, 250 Wis. 2d 647, 640 N.W.2d 220 (Ct. App. 2001). In *Richmond*, we addressed the circuit court's decision regarding the proper categorization of the appreciated value of a farm. *Id.*, ¶¶ 6–10. In that context, we said that the circuit court "erroneously exercised its discretion when it considered only contributions to the marriage as a whole and failed to determine whether [the parties'] contributions to the marital partnership throughout the marriage were in fact a catalyst for the rapid increase in the farm's value after 1995." *Id.*, ¶ 6. This characterization of the issue as discretionary, like the one in *McLaren v. McLaren*, 2003 WI App 125, 265 Wis. 2d 529, 665 N.W.2d 405, is in conflict with prior published case law.

the marriage received $300,000 in funds and a corresponding $300,000 debt. We understand Martha's response to be that nothing in WIS. STAT. § 767.255(2)(a) suggests that it matters why a debt is incurred or what the borrowed money is used for.[13]

¶ 48. We conclude that the mortgage debt is divisible because it is not exempt from division under WIS. STAT. § 767.255(2)(a). The exemptions in this statute refer to "property" acquired by "gift" or "[b]y reason of . . . death" or acquired with "funds" from either of those sources. Regardless whether debt can ever be conferred by gift or by reason of death within the meaning of § 767.255(2)(a), in this case the debt was not gifted to the parties, acquired by reason of death, or acquired with funds from either of those sources. Here, Michael and Martha took on the $300,000 debt in exchange for $300,000 in cash. It is true that Michael made the loan possible by putting equity in his apartment building at risk, but he did not in any meaningful sense "acquire" the debt with "funds acquired" from the gifted building from his parents, as those terms are used in § 767.255(2)(a)3.[14]

---

[13] Martha's main argument is that the circuit court looked at the discretionary factors in WIS. STAT. § 767.255(3), such as Michael's ownership of a substantial asset not subject to division (the apartment building), and properly exercised its *discretion* to categorize the mortgage debt as non-divisible. We have already explained the flaw in this argument. *See* ¶¶ 10, 45–46 & n.12.

[14] Although WIS. STAT. § 767.255(2)(a) does not on its face appear to contemplate an exemption for any debt, we do *not* hold that debt is never non-divisible. Several scenarios come to mind. Here are just two. First, suppose Michael had taken out an equity loan on his non-divisible apartment building, used the

¶ 49. We stress the limited nature of our holding. In this case, a gifted non-divisible asset was used as collateral for a loan. The marriage acquired an asset, $300,000 cash, and a debt of equal value. It was undisputed that the loaned money was used for the benefit of the marriage, that both parties were liable for the debt, and that marital funds were used to make payments on the debt. Under these circumstances, the debt is divisible.

## 2. The Apartment Building

¶ 50. The parties agree that the apartment building was Michael's non-divisible asset when he received it as a gift from his parents during the marriage. But they dispute whether the mortgage transaction and repayment of the mortgage debt with marital funds had the effect of converting Michael's apartment building to divisible property. Martha contends that the circuit court erred when it concluded that the apartment building was non-divisible. She argues that the building became wholly divisible because it lost both its "identity" and "character" as a result of the mortgage transaction. Michael takes the opposite view.

---

funds to repair the building, and made debt payments with inherited non-divisible money. Would the mortgage debt be divisible? Second, what would be the result if spouses divorced shortly after the husband sold a gifted non-divisible building for $200,000 and used that money as a down payment on a different $1,000,000 building, incurring $800,000 in mortgage debt in his name only and titling the building in his name only? Would the mortgage debt be divisible? Our opinion is not intended to suggest answers to these questions.

## a. Tracing Inquiry Applied

■■■■

¶ 51. With respect to tracing, there are no disputed historical facts. Thus, we address the tracing inquiry solely as a question of law. *See Popp*, 146 Wis. 2d at 787.[15] As set forth in ¶¶ 15–22 above, the tracing inquiry is the job of determining the value and source of an asset or the value and source of a part of an asset.

¶ 52. Martha's argument begins with the fact that the apartment building was used as collateral to secure the $300,000 mortgage loan and, therefore, to incur the corresponding $300,000 mortgage debt. She argues that the apartment building lost its "identity" because payments on the $300,000 mortgage debt were made with marital funds. Martha, relying on *Brandt*, states that "where marital funds are merged with a non-marital

---

[15] Regarding both identity (i.e., tracing) and character (i.e., donative intent), we acknowledged in *Finley*, 256 Wis. 2d 508, that we have been inconsistent in characterizing these questions as legal or factual. *Id.*, ¶ 43 n.8 (contrasting and comparing several cases). In this case, we rely on our 1988 decision in *Popp* for the proposition that, when the historical facts are undisputed, we treat tracing as a question of law. As we observed in *Finley*, some decisions subsequent to *Popp*, such as *Fowler v. Fowler*, 158 Wis. 2d 508, 518, 463 N.W.2d 370 (Ct. App. 1990), and *Weberg*, 158 Wis. 2d at 552, seemingly treat tracing questions as purely factual in nature. *Finley*, 256 Wis. 2d 508, ¶ 43 n.8. Assuming that *Popp* itself is good law on this topic, we must ignore subsequent inconsistent court of appeals decisions. *See State v. Bolden*, 2003 WI App 155, ¶¶ 9–11, 265 Wis. 2d 853, 667 N.W.2d 364, *review denied*, 2003 WI 126, 265 Wis. 2d 419, 668 N.W.2d 559 (No. 02–2974–CR). Because we find nothing suggesting that *Popp*'s holding on this topic is not binding, we follow *Popp*. Moreover, we note that *Popp* itself reconciles its pronouncement on this topic with our earlier decision in *Brandt*, 145 Wis. 2d at 407. *See Popp*, 146 Wis. 2d at 787 n.2.

asset, unless the non-marital component of that asset can be traced, identified and valued, the asset must be considered a marital one." Martha complains that neither Michael nor the circuit court made a tracing effort and, therefore, the circuit court failed to determine how the mortgage payments related to the current net value of the apartment building.

¶ 53. As best we can tell, Martha's argument boils down to this: When debt payments made with marital funds increase the "net value" of an otherwise non-divisible asset, the marital payments destroy the "identity" of part or all of the non-divisible asset. Applied to this case, Martha contends that some undetermined part of the net value (fair market value minus the outstanding mortgage debt) of the apartment building is attributable to mortgage payments and, because mortgage payments were made with marital funds, some undetermined part of the net value of the building has been converted to divisible property. We are not persuaded.

¶ 54. To the extent Martha is arguing "loss of identity," she misapprehends the nature of the inquiry. As we have explained, identity is a matter of tracing. The mortgage payments made by the marriage reduced the mortgage debt from $300,000 to $282,935, a reduction of $17,065. Thus, a $17,065 reduction in mortgage debt is directly traceable to mortgage payments made with marital funds.

¶ 55. If Martha had properly applied the tracing inquiry to the undisputed facts, she would have easily traced the $17,065 figure. Further, she would presumably be arguing that the mortgage payments made with marital funds increased the "net value" of the apartment building by $17,065, thereby making this amount divisible. We resolved the tracing part of this argument

721

in the last paragraph. But tracing does not tell us whether the $17,065 figure is divisible. We address that part of Martha's argument next.

### b. Martha's "Net Value" Theory

¶ 56.   Martha's "net value" argument is based on the proposition that the mortgage payments made with marital funds increased Michael's equity in the apartment building. Martha appears to take the position that this increased equity—$17,065—belongs to the marriage, not Michael, because it was paid for by the marriage. Under this view, the marriage made mortgage payments, but will get no benefit from those payments if it does not receive the resulting increased equity. But we could adopt this argument only if we viewed the transaction with blinders on.

¶ 57.   We agree that, if a marriage purchases equity in real estate, such equity is divisible. For example, in *In re Marriage of Torgerson v. Torgerson,* 128 Wis. 2d 465, 383 N.W.2d 506 (Ct. App. 1986), a wife used non-divisible money as a down payment on real estate and the marriage secured a mortgage loan for the balance needed for the purchase. *Id.* at 467. Thereafter, mortgage payments were made with marital funds. Upon divorce, the husband made no claim against the amount of the wife's down payment. *Id.* at 468. Pertinent here, we concluded that the remaining value of the real estate was divisible simply because it was purchased with marital funds. *Id.* at 469–70.

¶ 58.   The situation here is different. The mortgage loan proceeds were not used to purchase the apartment building and were not otherwise applied to the building. From the standpoint of the marriage, the

722

loan was a zero-sum game: the marriage acquired $300,000 in cash and $300,000 in debt. The mortgage payments did not increase Michael's wealth; they reduced marital debt. To repeat, Michael put equity in his building at risk when he allowed the building to be used as collateral for the marital loan. The only benefit he obtained as mortgage payments were made was a reduction in his risk.

¶ 59. Therefore, we reject Martha's argument that mortgage payments made with marital funds created equity in the apartment building belonging to the marriage.

### c. Donative Intent Inquiry Applied

¶ 60. When addressing donative intent, we defer to a trial court's findings of historical fact unless those findings are clearly erroneous. *See Popp*, 146 Wis. 2d at 801. Circumstantial historical facts may give rise to the presumption that an owning spouse gifted property to the marriage. *See* ¶ 33, *supra*. This presumption arises if the owning spouse acts in a manner that would normally evince an intent to gift. *Popp*, 146 Wis. 2d at 788–89. The presumption is subject to rebuttal by "sufficient countervailing evidence." *Trattles*, 126 Wis. 2d at 222–24. Because donative intent is ultimately a question of subjective donative intent, other evidence may persuade a circuit court that the owning spouse consciously considered the matter and subjectively intended that gifting not occur. *See* ¶ 40, *supra*.

¶ 61. Martha, using "character" terminology, argues that Michael's entire apartment building lost its non-divisible character when he used the building for a

marital purpose, that is, when he used it as collateral for the $300,000 equity loan. We understand Martha to be relying on *Finley, Friebel,* and *Trattles* for the following proposition: The presumption of donative intent arises when an owning party "uses" his or her non-divisible asset to acquire property for marital use. In each of those three cases, a spouse with non-divisible money (or non-divisible assets converted to money) used that non-divisible money to make purchases, make payments, or fund accounts for the benefit of the family. *Finley,* 256 Wis. 2d 508, ¶¶ 39–43; *Friebel,* 181 Wis. 2d at 298; *Trattles,* 126 Wis. 2d at 222, 224–27. Martha's argument hinges on her assertion that Michael similarly "used" his non-divisible apartment building when he used it as collateral to secure the $300,000 loan. She equates putting a non-divisible asset at risk by using it as collateral for a marital loan with selling the asset and then using the proceeds for a marital purpose.

¶ 62. To state Martha's argument clearly is to reveal its flaw. Michael's act of putting his building at risk to secure the mortgage loan does not evince an intent to give all or part of his building to the family. Such "use" of a non-divisible asset is far different than disposing of the asset in order to make a purchase for the family. Moreover, there is no testimony suggesting that Michael subjectively intended to donate his building to the family by allowing it to be used to secure the marital loan. We conclude that, without more, the act of putting property at risk by using it as collateral for a marital loan does not create a presumption that the owning spouse intended to donate part or all of the property to the marriage.

## II. Wasting

¶ 63. We next address the circuit court's treatment of $45,000 that Michael lost while engaging in the investment practice of day trading. Although the parties agree that this money was lost by Michael, they disagree as to whether the circuit court properly treated the $45,000 as a "wasted" asset under WIS. STAT. § 767.275.

¶ 64. A divisible asset worth $500 or more "which was transferred for inadequate consideration, wasted, given away or otherwise unaccounted for by one of the parties within one year prior to the filing of the [divorce] petition . . . shall be rebuttably presumed to be part of the estate for the purposes of [property division under] s. 767.255." WIS. STAT. § 767.275.[16] Michael argues that Martha had the initial burden of showing that Michael wasted the $45,000 and that he wasted it within one year of the filing of the divorce petition. Instead, according to Michael, the court erroneously put the burden on him to show both that he did not waste the money and that the loss occurred more than one year before the filing.

---

[16] WISCONSIN STAT. § 767.275 provides, in its entirety:

**Disposition of assets prior to action.** In any action affecting the family, except an action to affirm marriage under s. 767.02(1)(a), any asset with a fair market value of $500 or more which would be considered part of the estate of either or both of the parties if owned by either or both of them at the time of the action, but which was transferred for inadequate consideration, wasted, given away or otherwise unaccounted for by one of the parties within one year prior to the filing of the petition or the length of the marriage, whichever is shorter, shall be rebuttably presumed to be part of the estate for the purposes of s. 767.255 and shall be subject to the disclosure requirement of s. 767.27. Transfers which resulted in an exchange of assets of substantially equivalent value need not be specifically disclosed where such assets are otherwise identified in the statement of net worth.

725

¶ 65.   We first observe that, if Michael "wasted" the money, the court had the authority to treat that money as if it still existed for purposes of property division, regardless whether the waste occurred within one year of the filing of the divorce petition. In *Zabel v. Zabel*, 210 Wis. 2d 336, 565 N.W.2d 240 (Ct. App. 1997), we explained that WIS. STAT. § 767.275 does not "prevent a court from including in its property division assets transferred or otherwise disposed of more than one year from the commencement of the divorce proceeding." *Zabel*, 210 Wis. 2d at 340 n.3. We were less clear in *Zabel* about the effect the statute has on burden shifting. We said:

> The one-year period described in § 767.275 merely imposes a rebuttable presumption, shifting the burden of proof to the spouse attempting to exclude the asset as marital property. If the transfer occurred beyond the one-year period, we assume the burden remains on the spouse attempting to include the asset.

*Id.*

¶ 66.   Assuming, without deciding, that the burden of showing waste was on Martha, we conclude that she met that burden. Michael had control of all of the information pertinent to the question of waste. He testified and was questioned about how and when he lost the $45,000. The circuit court found that Michael was unwilling to give clear information, and that much of the information he did provide was not credible. The court implicitly but clearly rejected Michael's assertions that he did not remember. Thus, Michael's complaint that Martha failed to meet her burden of proof rings hollow. Michael had the relevant information and refused to provide it. *Cf. Lellman v. Mott*, 204 Wis. 2d 166,

175, 554 N.W.2d 525 (Ct. App. 1996) (party "cannot be heard to complain that [the income] approximation was excessive when the precise information available to make that determination was in his exclusive control").

¶ 67. In sum, the circuit court correctly concluded that Michael "wasted" the $45,000. The timing of the wasting is not critical here. As we explained in *Zabel*, WIS. STAT. § 767.275 does not prevent a court from counting wasted assets against the at-fault party in a property division just because the waste did not occur within the one-year time frame in that statute. *See Zabel*, 210 Wis. 2d at 340 n.3; *cf. In re Marriage of Anstutz v. Anstutz*, 112 Wis. 2d 10, 12–13, 331 N.W.2d 844 (Ct. App. 1983) (regardless when a marital asset was depleted, the circuit court has the discretion to consider a party's waste of marital assets in departing from the presumption of equal division under WIS. STAT. § 767.255(3)).

## III. Child Support

¶ 68. Michael argues that the circuit court erred when it calculated his child support obligation based on its finding that his monthly income was $3,200. Michael moved the circuit court to reconsider this income figure, arguing that the court failed to consider the effect of the property division, which required that he pay Martha a $157,417 equalizing payment. In his motion for reconsideration, Michael asserted that he would need to borrow the full $157,417 and that monthly payments on this new debt would reduce his monthly income by $845. Michael estimated his debt payments would be $845 by assuming a 5% thirty-year mortgage.

Putting aside whether such new debt payments would reduce Michael's "income" within the meaning of child support law, we conclude his argument has no merit.[17]

¶ 69.   Michael's argument ignores an important fact. The circuit court's determination of Michael's income was, necessarily, a rough approximation because Michael refused to provide coherent and reliable financial information. The circuit court explained why it was forced to use a rough approximation:

> Based upon the documented expenditures of Michael Derr, the confused state of his financial records and his unwillingness to provide clear responses to inquiry on cross examination, the court concludes that the reported income of $1,940 is not credible. Looking to other evidence in the record, deposits to a bank account controlled by Mr. Derr reflect average monthly deposits of $3,849 in 2000, $2,756 in 2001 and $2,875 in 2002, Exhibit 42. With perhaps more clarity, Mr. Derr reported his gross annual income to be $32,000, or $2,667 monthly, in April, 2002, when seeking a tuition scholarship from Edgewood Grade School, Exhibit 48. In June, 1999, Mr. Derr reported his annual income from rentals to be $50,000, or $4,167 monthly, on an application for a loan, Exhibit 49.

In its decision denying Michael's reconsideration motion, the circuit court emphasized that the information Michael supplied did not permit "more than an approximate determination of his true gross income." In light of the fact that the circuit court's original income determination was a rough approximation, the court was not

_____

[17] Michael also complains that the circuit court failed to explain how it followed the support guidelines and that it failed to provide reasons for deviating from the guidelines. But Michael provides no record cites and no supporting arguments. We will not address these undeveloped arguments.

required, upon motion for reconsideration, to precisely subtract the amount Michael alleged he would have to pay to service a new debt. We previously addressed noncooperation in financial disclosure and concluded that the uncooperative party "cannot be heard to complain that [an] approximation [of income for child support purposes] was excessive when the precise information available to make that determination was in his exclusive control." *Lellman*, 204 Wis. 2d at 175.

■

¶ 70. As an alternative argument, Michael contends that the child support decision cannot stand because a new loan taken against one of his rental properties would constitute a "business expense" that is reasonably necessary for production of his income and would, therefore, be excluded from the calculation of his income under Wis. Admin. Code § DWD 40.02 (Dec. 2003). Even assuming that this is an argument available to Michael in light of his failure to disclose his actual income, we reject it. Michael points to no authority supporting his characterization of a loan taken for purposes of making an equalization payment as a "business expense" under the child support income rules.

## Conclusion

¶ 71. We conclude that the circuit court correctly categorized the apartment building as Michael's non-divisible property, but that the court should have deemed the mortgage loan a divisible debt. We also conclude that the circuit court properly determined that Michael wasted the $45,000. Finally, we conclude that the court correctly determined Michael's income for purposes of child support. Accordingly, we affirm in part and reverse in part.

¶ 72. We remand because we cannot tell if the circuit court's erroneous categorization of the mortgage debt as non-divisible affected the property division. The circuit court believed that the divisible assets had a net value of $388,469 and awarded Martha 75% of this amount, that is, it awarded her $291,352 (.75 x $388,469). The court made this unequal property division because Michael had, in the court's words, a "very substantial asset not subject to division by the court, the [27–unit apartment building] with a net fair market value of $622,065." This $622,065 net equity was comprised of the apartment building's value, $905,000, less the outstanding mortgage debt, $282,935. Instead, the circuit court should have concluded that Michael had a non-divisible asset worth $905,000 and that the property subject to division had a net value of $105,534 ($388,469 less the mortgage debt of $282,935). The difference is that Michael actually has a more valuable non-divisible asset, but also the property subject to division is less. We understand that, as a practical matter, the circuit court needed to assign the mortgage debt to Michael because the building was Michael's non-divisible property. Still, we cannot tell if the court would have exercised its discretion in the same manner had it acted under a correct understanding of the divisible nature of the mortgage debt. On remand, the circuit court should exercise its discretion to divide divisible property in light of our categorization of the mortgage debt as divisible.

¶ 73. No costs to either party.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded with directions; order affirmed.