IN RE the MARRIAGE OF Linda C. WRIGHT,
Petitioner-Appellant,†

v.

Charles F. WRIGHT,
Respondent-Respondent.†

Court of Appeals

*No. 2006AP2111. Submitted on briefs May 1, 2007.
—Decided December 4, 2007.*

2008 WI App 21

(Also reported in 747 N.W.2d 690.)

† Petition to review denied 4/14/08.

156

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *Linda Roberson*, *Kevin J. Cords* and *Holly J. Slota* of *Balisle & Roberson*, S.C., of Madison.

On behalf of the respondent-respondent, the cause was submitted on the brief of *Bruce M. Peckerman* and *Jennifer J. Van Kirk* of *Peckerman & Klein* of Milwaukee.

Before Curley, P.J., Wedemeyer and Kessler, JJ.

¶ 1. WEDEMEYER, J. Linda C. Wright appeals from a judgment of divorce and a subsequent order resolving additional divorce-related issues and from an order denying her motion seeking reconsideration. She claims that the trial court erred: (1) when it held that Charles Wright's gifted FRG[2] stock and Baird account were non-divisible property; (2) because even if the FRG stock were non-divisible, the appreciation value of the stock should be divided equally as the growth in value of the stock was partly attributable to Charles's efforts during the marriage; (3) because even if the FRG

---

[2] "FRG" refers to Fall River Group.

stock was exempt from division, the retained earnings from the FRG stock should have been divided equally; (4) when it set a 45% tax rate to calculate maintenance; (5) when it failed to include income from FRG, Fall River Capital, Barclay, Quaestus, and the Baird account in calculating Charles's income for the purpose of the maintenance award; (6) when it denied Linda's request seeking contribution for paying her attorney's fees; and (7) when it denied her motion for reconsideration.

¶ 2. We affirm the trial court on all the issues with two exceptions. We hold that the money market portion of the Baird account transmuted to divisible property and therefore should have been split equally between the parties. Therefore, we reverse the order on that issue and remand to the trial court to determine the value of the account on the date of the divorce and enter an order distributing the property in accordance with that figure[3] and our opinion. We also hold that the trial court erred in excluding future income earned from Charles's business entities in setting the maintenance award. Therefore, we reverse the order on that issue and remand to the trial court with directions to consider all sources of Charles's income and modify the maintenance award accordingly.

### BACKGROUND

¶ 3. Linda and Charles were married on November 17, 1984. They had two children: Charles Jr., born March 8, 1986, and Andrew, born August 28, 1988. On April 28, 2004, Linda filed a petition for divorce. The case was tried in March 2006 and the trial court granted the divorce judgment on March 20, 2006. When

---

[3] This figure should also include any growth or loss from the date of the divorce to the date of division.

the trial court granted the divorce judgment, it found circumstances appropriate for equal division of property. The court then divided the marital estate equally, resulting in an award of $12,075,121 each to both Linda and Charles. Resolution of maintenance for Linda and the issue relating to gifted assets were resolved in a July 16, 2006 order, with two subsequent clarifications in addendums to that order. The court's order consisted of 121 pages, including 1062 points labeled findings of fact and fifty conclusions of law.

¶ 4.　Within that order as pertinent to this appeal, the trial court found that Charles's gifted FRG stock worth $10,777,904 and the FRG retained earnings were non-divisible. The trial court also found that the majority of the Baird account, which consisted primarily of proceeds from a terminated trust, was a gift to Charles and therefore non-divisible. The 1952 and 1962 trusts were also found to be gifts to Charles and non-divisible.

¶ 5.　With respect to maintenance, the trial court awarded Linda half of Charles's FRG salary, half of his FRG bonus or retained earnings distributions, half of FRG income reduced by retained earnings and a 45% tax rate, and half of the GRAT[4] distributions. The trial court did not include as Charles's income, for purposes of maintenance, any distributions from Fall River Capital, Quaestus, and Barclay.

¶ 6.　Linda's motion seeking an attorney's fee contribution was denied in August 2006. Linda's motion seeking reconsideration was denied in October 2006. Linda now appeals "the court's determinations on the gifted nature of the FRG stock and the Baird account, the award and calculation of maintenance, the exclu-

---

[4] "GRAT" refers to Grantor Retained Annuity Trust.

sion of FRG retained earning from property division, and the denial of her motions for a fee contribution and reconsideration."

DISCUSSION

¶ 7. Linda's issues on appeal can be divided into four general categories: (1) her contention that the trial court erred with respect to its determinations on the gifted nature of Charles's property; (2) the 45% tax rate was erroneous; (3) her contention that the trial court erred when it determined what income of Charles should be used for setting maintenance; and (4) her claim that the trial court should have granted her motion seeking attorney's fees. We address each in turn.

*A. Gifted Property.*

¶ 8. Linda's first contention relates to complaints with respect to the trial court's findings that certain property of Charles was gifted or inherited and therefore exempt from the equal property division. Specifically, she claims that the FRG stock could not be reliably traced to an original gifted asset; that the income generated from the FRG stock is subject to division; that the Baird account (with the exception of the Badger Meter stock) cannot be reliably traced to the original gift; that the appreciation of the FRG stock should be divided because the appreciation was partly due to Charles's efforts during the marriage; and that the retained earnings from the FRG stock are subject to division.

STANDARD OF REVIEW AND APPLICABLE LAW

■■■■

¶ 9. A trial court's determination of "how to divide *divisible* property is discretionary." *Derr v. Derr,* 2005

166

WI App 63, ¶ 9, 280 Wis. 2d 681, 696 N.W.2d 170; *see Friebel v. Friebel*, 181 Wis. 2d 285, 293, 510 N.W.2d 767 (Ct. App. 1993). A trial court may also need to make underlying factual determinations or decide legal issues as a part of its discretionary decision. Wisconsin Stat. § 767.61(2)(b) (2005–06)[5] states that gifts or inheritances are not subject to division upon divorce unless hardship is shown. Interpretation of a statute is a question of law. *See Arneson v. Arneson*, 120 Wis. 2d 236, 242–43, 355 N.W.2d 16 (Ct. App. 1984). The burden of showing that property should be excluded from the marital estate is on the party asserting the claim. *Brandt v. Brandt*, 145 Wis. 2d 394, 408, 427 N.W.2d 126 (Ct. App. 1988). Findings of fact will not be set aside unless they are clearly erroneous. WIS. STAT. § 805.17(2).

¶ 10. The appreciated value of a non-marital gift maintains its non-marital status where the appreciation is due to general economic conditions and where the non-owning spouse did not make contributions occasioning the appreciation. *See Plachta v. Plachta*, 118 Wis. 2d 329, 333–34, 348 N.W.2d 193 (Ct. App. 1984). This court has also explained that while the appreciated value of non-marital property may retain its non-marital status, income generated by exempt stock which is used to obtain additional property must be included in the marital estate, *Arneson*, 120 Wis. 2d at 244–45; however, income generated from a trust where the beneficiary has no control over the trust is not subject to property division. *Friebel*, 181 Wis. 2d at 294–95.

[5] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

## 1. FRG Stock.

¶ 11. Linda makes several arguments with respect to FRG stock. The first is that the value of this stock could not be reliably traced and therefore Charles failed to meet his burden of demonstrating that the asset is non-divisible. Before we analyze this issue, we set forth the general controlling law.

¶ 12. The burden of proving that property is non-divisible lies with Charles because he is the party arguing that this property is exempt from division. *Brandt*, 145 Wis. 2d at 407–08. In order to satisfy the burden, Charles must establish: (1) the original gifted or inherited status of the property; and (2) that the character and identity of the property has been preserved. *Id.* at 408. In *Derr*, we modified the terms "character" and "identity" in order to clarify the terminology. *Derr*, 280 Wis. 2d 681, ¶ 8. Because "[t]he 'identity' inquiry 'addresses whether the gifted or inherited asset has been preserved in some present identifiable form,' " it is more a matter of *tracing* the asset. *Id.*, ¶ 15 (citation omitted). Because the "character" inquiry actually examines "whether the owning spouse intended to donate non-divisible property to the marriage," it is more clearly denoted as *donative intent. Id.*, ¶ 23.

¶ 13. Thus, we examine first the FRG stock. It is undisputed that Charles owns 14,135 shares of FRG stock, and 13,448 of those shares were gifted to him. The remaining 687 shares he purchased from his brother in 1983. The trial court found that Charles satisfied his burden of proving that the *gifted* stock was non-divisible. The trial court found William Alverson's and Charles's testimony to be credible on this issue that the 13,448 shares of FRG stock, which Charles holds

today, are the same 13,448 shares of FRG stock, originally gifted to him by his father and grandmother prior to the marriage. Alverson, an FRG Board Member and the corporation secretary, testified that the stock shares are the same stock and have not changed. The parties stipulated that the common shares held by Charles have not changed since 1978, which was years before the marriage.

¶ 14. The inquiry to prove that the FRG stock was non-divisible property involved tracing the asset. Here, the shares have remained the same—they are the original asset. Similarly, there is no evidence that Charles at any time evinced a donative intent to transfer the stock into the marital estate. We conclude that Charles satisfied his burden of proving that the 13,448 shares of FRG stock remained his separate gifted property.

¶ 15. When the owning spouse has satisfied his or her burden, the burden shifts to the non-owning spouse to establish that the property is divisible. *Brandt*, 145 Wis. 2d at 409. The trial court found that Linda failed to satisfy such burden. We agree. Based on the record before us, there is no evidence to show that the gifted shares of FRG stock became divisible. The gifted stock at the time of the divorce was traceable back to the originally gifted stock and there was no evidence, objective or subjective, that Charles intended to donate this gift to the marital estate.

¶ 16. Linda contends that there was no evidence of a specific value attached to the original gift of stock, and therefore it is impossible to determine the current portion of the stock's value attributable to the original gift. This argument relates to the *appreciation* of the

value of the stock. Linda argues, in essence that because the original value of the gifted stock was not in evidence, the appreciation of the stock cannot be determined and, as a consequence, all of the stock becomes divisible. The trial court rejected this contention, as indicated in the order, because it found the appreciation of the stock was also non-divisible. We agree with the trial court's determination.

■

¶ 17. Linda next contends that even if the stock itself was not a divisible asset, the amount of *appreciation* of the stock, which occurred during the marriage, should constitute a divisible asset. Generally speaking, assets which are separate property are not subject to division at divorce regardless of appreciation or depreciation in value. *Plachta,* 118 Wis. 2d at 333. Over the years, however, courts have carved out exceptions to the general rule if it is shown that the gifted/inherited property has appreciated *during the marriage due to the efforts of either the owning or non-owning spouse. Krejci v. Krejci,* 2003 WI App 160, ¶ 24, 266 Wis. 2d 284, 667 N.W.2d 780; *Haldemann v. Haldemann,* 145 Wis. 2d 296, 301, 426 N.W.2d 107 (Ct. App. 1988).

¶ 18. Linda argues that the FRG stock appreciation was due at least in part to Charles's efforts and therefore any appreciation constitutes marital property. Specifically, she points out that the FRG stock was Charles's primary source of employment during the marriage, that he ran the board meetings and met with the division managers, and even after he was no longer at the office, he kept abreast of financial information and made recommendations. She also asserts that Charles's efforts were the reason why FRG retained Ray Weigel, who ran the day-to-day operations of the corporation. She points out that when Weigel expressed

intent to leave FRG to start his own foundry, Charles convinced Weigel to stay by making him a partner and giving him control and power in the corporation. Linda then directs us to the increase in sales, working capital, and net income of the FRG stock by citing numbers in these three categories prior to the marriage compared to June 30, 2005.

¶ 19. The trial court rejected this argument, finding that Charles was not responsible for the appreciation of the company's stock or the success of the company. Rather, the trial court found that Ray Weigel was responsible for the success of FRG and therefore, based on *Wierman v. Wierman*, 130 Wis. 2d 425, 387 N.W.2d 744 (1986), the stock appreciation was attributable to forces other than the owning or non-owning spouse. As a result, the appreciation of the FRG stock was not a divisible asset. Based on our review of the record, we cannot conclude that the trial court erred in this determination.

¶ 20. The trial court's findings on this issue are comprehensive and in-depth. It considered all of Linda's arguments and found them all to be without merit. The court cited the testimony of a variety of witnesses, who testified that after 1982, Charles was not involved in running the day-to-day operation of FRG, that Charles was not experienced in running a foundry, and that Charles delegated all authority to Weigel to run the company. The trial court found the testimony of these witnesses to be credible and found that Charles had not

actively managed the Fall River Group or personally caused any appreciation in its stock. In fact, the court finds that given [Charles's] very few visits to the Fall River Foundry and the lack of testimony about any visits by [Charles] to the Fall River Group's other

divisions that he was not and could not have been responsible for any growth in the Fall River Group stock.

¶ 21. We cannot conclude that the trial court erred in reaching its credibility determination. Linda proffers a variety of evidence that conflicts with the trial court's determination, including her own testimony. Resolution of conflicting testimony, however, is not the role of this court. The trial court is the arbiter of the credibility of the witnesses, as it had the opportunity to assess credibility, based on demeanor and other first-hand observations. *See Noble v. Noble*, 2005 WI App 227, ¶ 16, 287 Wis. 2d 699, 706 N.W.2d 166. If there is credible evidence to support the trial court's determination, we will not overturn it based on testimony in the record that conflicts with the testimony upon which the trial court relied. *See Global Steel Prods. Corp. v. Ecklund*, 2002 WI App 91, ¶ 10, 253 Wis. 2d 588, 644 N.W.2d 269. Accordingly, we affirm the trial court's rulings with respect to the non-divisibility of the FRG stock and with respect to its determination that the appreciation of the FRG stock is not divisible.

¶ 22. Linda's final argument with regard to the FRG stock is that the trial court erred in *ruling* that the retained earnings were not divisible because they consisted of insurance proceeds rather than income. Linda argues that retained earnings from gifted/inherited companies are always marital assets because income generated by a separate asset is distinct from the asset itself. *See Metz v. Keener*, 215 Wis. 2d 626, 632, 573 N.W.2d 865 (Ct. App. 1997).

¶ 23. Linda is correct in part—retained earnings from a separate asset may be considered a marital

asset; *see id.*, however, under the circumstances in the instant case they are not. The trial court found that the current "retained earnings" of the FRG stock were not income generated; but rather were insurance proceeds from the loss of an asset. Linda argues that the insurance proceeds were not compensation for the loss of an asset, but were compensation for the loss of income. When insurance proceeds compensate for the loss of a gifted asset, they are non-divisible. When insurance proceeds compensate for the loss of income, they are divisible. Here, the trial court determined that the insurance proceeds compensated for the loss of the asset. This finding is not clearly erroneous. Thus, under the unique circumstances in this case, the insurance proceeds were not income. We therefore are not inclined to overturn the trial court's determination that these particular retained earnings are not divisible.

2. Baird Account.

¶ 24. Linda next argues that the trial court erred as a matter of law in ruling that the Baird account was not divisible. She contends that at the time of divorce, the Baird account consisted of Badger Meter stock, TradeStation stock and a money market account. The money market account held dividends from the Badger Meter stock, from the money market account itself and cash deposits. Linda argues that a series of transactions transmuted the money market account and TradeStation stock from separate property to marital property. Linda does not contend that the Badger Meter stock constitutes a divisible assert.

¶ 25. Again, as noted above, Charles bears the initial burden of proving that the TradeStation stock and money market account were: (1) originally gifted or inherited property; and (2) that the character and

identity of the property has been preserved. *See Brandt*, 145 Wis. 2d at 408. In order to do so, he must demonstrate that the contents of the account can be traced to the original gift/inheritance and that no donative intent occurred during the marriage.

¶ 26. Here, Linda contends that Charles failed to satisfy this burden for a variety of reasons. She points out that $82,601.17 in divisible dividends were reinvested and deposited into the money market account—thus, changing the status of the money market account from separate to commingled property. She also proffers that Charles's contention that the cash deposited into the money market account between 1998 and 2005 was distributions from two other gifted trusts does not mathematically match the deposits into the account. She refers to Charles's testimony during the divorce trial, where he admits that it is "highly possible" that marital funds were also deposited into the account.

¶ 27. Charles responds that any "disparity" in the difference between the actual deposits into the money market account and the amount of gifted funds deposited into this account is due to the interest income calculation, which was calculated only through 2004, whereas the deposits were through 2005.

¶ 28. The trial court ruled that the money market account maintained non-divisible status. It found that Charles established that the money market account was opened with gifted/inherited assets, and that the account maintained its character as separate property.

¶ 29. In reviewing the record, we agree in part and disagree in part with the trial court's determination. We are not persuaded by Linda's contention that the presence of the $82,601.17 in divisible dividends

transmuted the money market account into one in which commingling occurred. It is undisputed that nothing has ever been withdrawn from the money market account. Therefore, it is very easy to trace the original gifted asset, despite the $82,601.17 divisible dividend within the account. Commingling of separate and marital property does not automatically taint the gifted asset. *Friebel*, 181 Wis. 2d at 298–99. Here, the divisible dividend of $82,601.17 did not taint the status of the original gift and as noted by Charles was included in the divisible estate by the court.

¶ 30. We are, however, concerned by the fact that the amount of the other deposits into the money market account, which were supposedly all from other gifted sources do not match the deposit figures. It appears that deposits from other unaccounted for sources were deposited into the money market account. When asked about this at the trial, Charles testified that it may be that the other sources were marital property.

¶ 31. On appeal, Charles suggests that the disparity can be accounted for in other ways. Nevertheless, Charles bears the burden of proving that the character and identity of the gifted asset has been maintained in order to exclude it from the divisible estate. The presumption is that all property will be equally divided, unless that burden has been satisfied. It is clear from our review of the record that Charles failed to satisfy that burden. Even assuming, as Charles argues, that the disparity is due to an omission in the interest calculation, the lack of clarity in tracing the asset results in a failure to satisfy his burden. Likewise, Charles's admission during his testimony that marital property may have also been deposited into the money market account demonstrates subjective donative in-

175

tent. Thus, Charles's failure to clearly, and accurately, affirmatively account for the deposits into the money market account result in a conclusion that the account did not maintain its gifted/inherited character or identity. Rather, the unaccounted for deposits resulted in the transmutation of the money market account into a divisible account. Accordingly, we conclude that the trial court erred as a matter of law when it determined that Charles satisfied his burden of proving that the money market account was non-divisible property. We reverse the trial court order with respect to this issue and remand with directions that the proceeds in the money market account as of the date of the divorce, together with such interest as may have been accrued on the account through the date the division is accomplished be divided equally between Charles and Linda.

¶ 32. The next asset at issue is the TradeStation account. Linda contends that the TradeStation stock was purchased in the year 2000 with funds from the money market account. Charles purchased 57,600 shares for $171,845. At the time of the divorce, the stock was valued at $713,088. The trial court found that the TradeStation stock was non-divisible. That finding is supported by the record. Charles's testimony was that the TradeStation stock was purchased with gifted money. Because the TradeStation stock was purchased with a gift, it is non-divisible. The trial court's determination in this regard is affirmed.[6]

---

[6] Linda also claims that the trial court erred in finding that FRG's future retained earnings will be distributed, with 50% paid to Linda as maintenance. Specifically, Linda argues that future distributions would have to exceed 100% of the future income for distributions to be paid. We are not persuaded by her

*B. 45% Tax Rate.*

¶ 33. The next issue relates to the trial court's determination that a tax rate of 45% be utilized when calculating maintenance payments. Linda argues that the trial court erred when it found this tax rate to be the appropriate one to use. The trial court's determination of what tax rate to set involves fact finding, which we cannot overturn unless it is clearly erroneous. WIS. STAT. § 805.17(2).

¶ 34. In the July 2006 order, the trial court made the following finding: "The tax consequences of the parties are particularly taken into consideration with respect to the Wright Cash Flow Allocation which is attached hereto and incorporated by reference herein." The Wright Cash Flow Allocation set the personal tax rates at 45%. Linda claims this finding was erroneous and without any basis in the record. We disagree.

¶ 35. The record reflects testimony from Charles's expert that the past marginal tax rates ranged from 38% to 44.5%. The record reflects that Linda's expert found a range of effective past tax rates from 30.5% to 45.2%. Based on this information, we cannot conclude that the trial court's finding of 45% was clearly erroneous. Although the trial court elected to impose the higher tax rate, it was within the range of what the

argument. The trial court's finding is supported by the evidence in the record, including the testimony of Linda's expert witness, who testified that 96% of FRG's retained earnings are historically paid out as distributions based on the distribution formula, and that eventually all of FRG's earnings will be distributed. Accordingly, there is no basis upon which we can reverse the trial court's ruling in this regard.

177

experts proposed. Accordingly, we affirm the trial court's decision in this regard.

## C. Calculation of Maintenance.

¶ 36. Linda's next contention is that the trial court erred when it failed to include a variety of sources of Charles's income when awarding maintenance. Specifically, she argues that distributions from Fall River Capital, Barclay, Quaestus, income generated by the Baird account and income from all other businesses should have been included. She argues that she requested the trial court to base its maintenance award on income from all sources: "any income from all sources is fair game for maintenance."

¶ 37. We review a maintenance determination under the discretionary standard of review. *Olski v. Olski*, 197 Wis. 2d 237, 243 n.2, 540 N.W.2d 412 (1995). We will affirm the trial court's determination if it reviewed all the pertinent facts, applied the correct law and reached a reasonable determination. *Id.* The trial court is obligated to consider all income sources, ordinary and extraordinary, when making its determination. *Dowd v. Dowd*, 167 Wis. 2d 409, 415, 481 N.W.2d 504 (Ct. App. 1992). In addition, whether income from assets awarded in an equal property division should be considered in calculating a spouse's income available for maintenance is a question of law. *Hommel v. Hommel*, 162 Wis. 2d 782, 788, 471 N.W.2d 1 (1991).

¶ 38. The trial court awarded maintenance from the Fall River Group Salary and Bonuses, the Fall River Group Subchapter S Distributions, GRAT Distributions and Fall River Group Retained Earnings Distributions. The trial court did not include distributions or income

from Fall River Capital, Barclay or Quaestus or any other business interests.[7] The reasons provided by the trial court for not including any distributions or income from these entities were: (1) these entities are not currently making money and therefore including them in the maintenance income consideration would be speculative; (2) any future earnings from these sources will constitute a return on capital, not a source of income; and (3) counting income from these entities would constitute "double-counting" because the value of the companies was included in the property division. The trial court's reasons are all erroneous.

¶ 39. First, the fact that a potential source of income, which has produced in the past, is not currently producing income, should not eliminate it as a source of income in a maintenance determination. The general rule is that the trial court is obligated to consider *all sources of income* when establishing maintenance. *Dowd*, 167 Wis. 2d at 415. "Income" is defined as all taxable and non-taxable income including, but not limited to, salary and wages, investment income, and "[u]ndistributed income of a corporation, including a closely-held corporation, or any partnership, including a limited or limited liability partnership, in which [a party] has an ownership interest sufficient to individually exercise control or to access the earnings of the business." WIS. ADMIN. CODE § DWD 40.02(13).

---

[7] Fall River Capital, Quaestus and Barclay are business interests, the current value of which was awarded to Charles during the equal property division. Fall River Capital is a limited liability corporation hedge fund of which Charles is 50% owner. Quaestus is a venture capital firm in which Charles is a 1/3 owner. Barclay is a subchapter-S corporation in which Charles is a 1/3 owner.

179

¶ 40. Thus, in setting maintenance, the trial court should have included in the calculation, income from the investments in which Charles had a substantial ownership interest. The fact that the entities referred to were not producing income at the time of the divorce does not mean they should not be considered. The trial court included within the income calculation any bonuses from FRG, even though Charles was currently not receiving a bonus. This case does not involve a fixed amount of Charles's maintenance income based on Charles's current earnings, but rather involves a maintenance award calculated as a percentage. If the entities earn income, Linda should receive 50% of what Charles receives. The fact that the entities are currently not earning an income is not a factor which should eliminate them from the maintenance consideration.

¶ 41. The trial court also stated that any future earnings would not constitute income, but would be capital returns. Such a finding is clearly erroneous. There is no evidence that future distributions will constitute a return of capital rather than a source of income. There is no evidence because it has not happened yet. Such allocation between income and capital distributions is a factual issue which cannot be determined until it actually happens. Thus, it was an error for the trial court to exclude the business entity future income.

¶ 42. Finally, the trial court decided to exclude Charles's business entities future income from the maintenance calculation because it would constitute double counting. The principal value of these entities had already been assessed and divided during the

property division portion of the case. Although the law does not permit double counting of an asset for both property division and maintenance, *see Kronforst v. Kronforst*, 21 Wis. 2d 54, 64, 123 N.W.2d 528 (1963), that principle does not apply to *income* from assets awarded in a property division. *Hommel*, 162 Wis. 2d at 792. Income from assets awarded to a spouse as part of an equal property division are generally included in calculating that spouse's income for maintenance. *Id.* The double-counting rule prevents the principal value of the asset from being counted twice. The future income generated from the asset is separate and distinct from the asset itself, and therefore can be included in the spouse's income for maintenance calculations.

¶ 43. Based on the foregoing, we conclude that the trial court erred in excluding from the maintenance calculation the future income generated from the Fall River Capital, Quaestus, Barclay and other business interests awarded to Charles. Accordingly, we reverse that portion of the order and remand to the trial court to conduct whatever proceedings necessary to address our decision on this issue. We remand, in part, in response to Charles's contention that Linda never raised this issue to the trial court with respect to entities other than the three specifically mentioned. It is clear from the record that Linda did raise the issue in the trial court, but that the trial court only specifically addressed Fall River Capital, Quaestus and Barclay. On remand, the trial court should consider income from *all sources* in determining the maintenance calculation.

*D. Attorney's Fees.*

¶ 44. Linda's final argument is that the trial court erred in denying her motion seeking contribution for her attorney's fees. We are not convinced.

181

¶ 45. It is within the trial court's discretion to determine if an award of attorney's fees is appropriate. *See Van Offeren v. Van Offeren*, 173 Wis. 2d 482, 499, 496 N.W.2d 660 (Ct. App. 1992). We must give deference to the trial court's exercise of discretion. See Village of Shorewood v. Steinberg, 174 Wis. 2d 191, 204, 496 N.W.2d 57 (1993).

. ¶ 46. When examining whether to award attorney's fees the court must consider numerous factors. Traditionally, an analysis of attorney's fees and costs centers on each parties' financial needs and capabilities. *See Nelsen v. Candee*, 205 Wis. 2d 632, 645, 556 N.W.2d 784 (Ct. App. 1996). Other appropriate considerations include the reasonableness of the fees, *see Selchert v. Selchert*, 90 Wis. 2d 1, 16, 280 N.W.2d 293 (Ct. App. 1979), and the reasonableness of the divorced party's lifestyle and willingness to "over try" cases at an increased expense to the ex-spouse, *Ondrasek v. Ondrasek*, 126 Wis. 2d 469, 483–84, 377 N.W.2d 190 (Ct. App. 1985). The court may also consider each party's willingness to compromise, rather than expend legal fees. *See Nelsen*, 205 Wis. 2d at 646.

¶ 47. Based on our review, we cannot conclude that the trial court erroneously exercised its discretion in denying Linda's motion for fees. The trial court ruled:

> [t]he bottom line is after considering the financial resources of both parties, the respondent is not required to pay any money towards costs, or attorney's fees, or professional fees in this case. The petitioner has financial resources to pay those fees herself. There was

no overtrial, and the respondent's counsel did not refuse to provide information . . .

In this particular case, the court finds that the petitioner has failed to meet her burden of proof that she is entitled to contribution towards attorney's fees, costs, professional fees or costs . . . .

The trial court's decision was based on the pertinent facts, the correct law and was reasonable. This was a difficult and complex case. It took a very long time to sort through all the issues and all the assets. The trial court found that the fees were reasonable, that the case was not overtried and that Linda did not demonstrate a financial need for contribution. In reviewing the record and the testimony, we conclude that the trial court's findings were reasonable. Accordingly, we affirm the trial court on this issue.[8]

*By the Court.*—Judgment affirmed; orders affirmed in part; reversed in part and cause remanded with directions.

---

[8] Linda also contends that the trial court erred in denying her motion seeking reconsideration. To the extent that this court has reversed the trial court order, we agree that the trial court erred. To the extent that we affirm the trial court order, we deny Linda's contention that the trial court erred. Based on our analysis above, it is not necessary for us to address in any further detail this issue.